## PRECISION CONTROL GRAPHICS, LLC
## OPERATING AGREEMENT

THIS OPERATING AGREEMENT (this "Agreement") dated this 3rd day of *April*, ~~2005~~ 2006 is made by and between the Members of Precision Control Graphics, LLC signatory hereto.

### EXPLANATORY STATEMENT

PRECISION CONTROL GRAPHICS, LLC (the "Company") was formed pursuant to Articles of Organization recorded on November____, 2005, with the Maryland State Department of Assessments and Taxation. In order to reflect the relationship among the Members of the Company, the parties have agreed to operate the Company in accordance with the terms and subject to the conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises, the mutual covenants hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

### ARTICLE I
### GENERAL

Section 1.1.    Name of Company; Organization.    The name of the Company shall be "PRECISION CONTROL GRAPHICS, LLC." The Company may do business under that name and such variations thereof and other names as the Board of Directors deems appropriate.

Section 1.2.    Principal Office and Resident Agent. The principal office address of the Company in the State of Maryland shall be 10324B Baltimore National Pike, Ellicott City, Maryland 21042 or such other place as the Board of Directors may determine. The name of the resident agent of the Company is Richard K. Warner, whose address is 10324B Baltimore National Pike, Ellicott City, Maryland 21042.

Section 1.3.    Purposes of Company. The purposes for which the Company is formed and the business and objects to be carried on and promoted by it are:

(i)    to engage in the business of development, licensing and implementation of commercial and residential infrastructure controls and graphic interface systems, managing revenue cycles therefrom and follow-up work related thereto;

(ii)    to engage in any one or more businesses or transactions, or to acquire all or any portion of any entity engaged in any one or more businesses or transactions, as is permissible under the Act, as amended from time to time, and which businesses or transactions the Board of Directors may from time to time authorize or approve, whether or not related to the business described elsewhere in this Section 1.3 or to any other business at the time or thereafter engaged in by the Company.

The foregoing enumerated purposes and objects shall in no way be limited or restricted by reference to, or inference from, the terms of any other clause of this or any other Article of this Agreement, and each shall be regarded as independent, and they are intended to be and shall be construed as powers as well as purposes and objects of the Company and shall be in addition to and not in limitation of the general powers of limited liability companies under the General Laws of the State of Maryland. Furthermore, the enumerated purposes and objects shall in no way be deemed to restrict the Members from engaging in business activities themselves or through affiliates competitive with the Company business as defined herein, subject to such limitations as may be contained in Affiliate Agreements the Members shall form as part of the Company business



**EXHIBIT**

A

tabbies®

subject to such limitations as may be contained in Affiliate Agreements the Members shall form as part of the Company business

Section 1.4.    Authority of the Company.   The Company shall have all the general powers as set forth in Section 4A-203 of the Act.

Section 1.5.    Title to Company Property.   All property owned by the Company shall be owned by the Company as an entity, and no Interest Holder, individually, shall have any ownership interest in such property.   The Company may hold any of its assets in its own name or in the name of its nominee, which nominee may be one or more individuals, corporations, limited liability companies, partnerships, trusts or other entities, including any Interest Holder.

Section 1.6.    Existence.   The existence of the Company shall be for twenty-five years.

## ARTICLE II
## DEFINITIONS

Defined Terms.   As used herein, the following terms and phrases shall have the meanings indicated, unless the context otherwise requires:

"Accountants" means such firm of independent certified public accountants as may be engaged by the Board of Directors from time to time for the Company.

"Act" means the Maryland Limited Liability Company Act, as amended from time to time.

"Adjusted Capital Account Deficit" means, with respect to any Interest Holder, the deficit balance, if any, in the Interest Holder's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i)    the deficit shall be decreased by the amounts which the Interest Holder is obligated to restore, if any, pursuant to this Agreement or is deemed obligated to restore pursuant to Regulation Section 1.704-1(b)(2)(ii)(c); and

(ii)    the deficit shall be increased by the items described in Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"Affiliate" means: (i) any corporation, limited liability company, partnership, trust or other Person directly or indirectly controlling, controlled by or under common control with the Person to which this definition is applied and (ii) any officer, member, director, trustee or general partner of any Person described in (i) above.   For purpose of this definition, "controlling" or "controlled" shall mean owning, directly or indirectly, 50% or more of an entity's outstanding voting interests, capital interests or profits interests.

"Agreement" means this Operating Agreement as the same may be amended and in effect from time to time.

"Articles of Organization" means the Articles of Organization filed with the State Department of Assessments and Taxation of the State of Maryland on November ___, 2005 for the purpose of forming the Company, and all amendments thereto and restatements thereof.

"Available Cash" means, for a taxable year, all cash revenues of the Company (other than Capital Contributions or proceeds from a Capital Transaction or the winding up of the Company), less the sum of the following payments and expenditures to the extent the same are made from such cash revenues during such taxable year:

(i)  all principal and interest payments on indebtedness of the Company, including debts owing to any Interest Holder, payable during such taxable year, and all other sums paid to lenders;

(ii)  all cash expenditures incurred incident to the normal operations of the Company's business, including but not limited to any management fees and expenses due to the Board of Directors or as described in Article VI hereof; and

(iii)  the amount of any funds set aside by the Board of Directors for the establishment and maintenance of reasonable and prudent reserves.

"Bankruptcy" shall mean, with respect to any Interest Holder, the occurrence of any of the following events:

(i)  an assignment for the benefit of creditors by the Interest Holder;

(ii)  the Interest Holder files a voluntary petition of bankruptcy under the U.S. Bankruptcy Code;

(iii)  the adjudication of an Interest Holder as bankrupt or insolvent or the entering against the Interest Holder an order for relief in any bankruptcy or insolvency proceeding;

(iv)  the filing of a petition or answer seeking for the Interest Holder any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

(v)  the consent or acquiescence by the Interest Holder of the appointment of a trustee for, receiver for, or liquidation of the Interest Holder or of all or any substantial part of the Interest Holder's properties;

(vi)  the filing by the Interest Holder of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Interest Holder in any proceeding described in subsections (i) through (v) above; or

(vii)  the commencement of any proceeding against the Interest Holder seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, which continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver or liquidator for the Interest Holder or all or any substantial part of the Interest Holder's properties without the Interest Holder's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated.

"Board of Directors" or "Directors" means the Persons designated in, or in accordance with, Section 4.3 hereof to manage the operations of the Company.

"Bona Fide Offer" means an offer to purchase Interests which is (a) in writing, (b) from a Person who is neither an Interest Holder nor an Affiliate of an Interest Holder, and (c) from a Person or entity which has the financial wherewithal to consummate the purchase.

"Capital Account" means the account maintained by the Company for each Interest Holder in accordance with the following provisions:

(i) each Interest Holder's Capital Account shall be increased by the Interest Holder's Capital Contributions, the amount of any Company liabilities assumed by the Interest Holder (or which are secured by Company property distributed to the Interest Holder), the Interest Holder's allocable share of Profit, and any item in the nature of income or gain specially allocated to such Interest Holder pursuant to the provisions of Article VIII hereof (other than Section 8.3(iv) hereof); and

(ii) each Interest Holder's Capital Account shall be decreased by the amount of money and the fair market value of any Company property distributed to the Interest Holder, the Interest Holder's allocable share of Loss, and any item in the nature of expenses or losses specially allocated to the Interest Holder pursuant to the provisions of Article VIII hereof (other than Section 8.3(iv) hereof).

If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Interest. If the book value of Company property is adjusted pursuant to Section 8.3(iv) hereof, the Capital Account of each Interest Holder shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment.

Each Interest Holder's Capital Account shall be further adjusted as necessary for the Interest Holders' Capital Accounts to be determined and maintained in accordance with the Regulations adopted under Section 704 of the Code, including those provisions applicable to contributions and distributions of property to the extent applicable. It is intended that the Capital Accounts of all Interest Holders shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation. In the event the Board of Directors shall determine that it is prudent to modify the manner in which the Capital Accounts, or any decreases or increases thereto, are computed in order to comply with such Regulations, the Board of Directors may make such modification, provided that it is not likely to have a material effect on the amounts to be distributed to any Interest Holder pursuant to the other provisions of this Agreement upon the dissolution of the Company.

"Capital Contribution" means the total amount of cash and the fair market value of any other assets of value contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by an Interest Holder, net of liabilities assumed or to which such assets are subject, as capital in accordance with this Agreement. Any reference in this Agreement to the Capital Contribution of a current Interest Holder shall include any Capital Contribution previously made to the Company by any predecessor in interest to the current Interest Holder.

"Capital Proceeds" means the gross receipts received by the Company from a Capital Transaction.

"Capital Transaction" means any transaction not in the ordinary course of business which results in the Company's receipt of cash or other consideration other than Capital Contributions, including, without limitation, proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, recoveries of damage awards and insurance proceeds.

"Code" means the United States Internal Revenue Code of 1986, as amended, or any corresponding section of any succeeding law.

"Company" means the limited liability company existing under the Articles of Organization, as amended from time to time.

"Consent of Members" means the affirmative vote of those Members who hold more than fifty percent (50%) of the aggregate Percentages of Interests of the Members.

"Dissolution" means, with respect to any Interest Holder, the occurrence of any of the following events:

    (i)    if the Interest Holder is acting as an Interest Holder by virtue of being a trustee of a trust, the termination of the trust;

    (ii)    if the Interest Holder is a partnership or another limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

    (iii)    if the Interest Holder is a corporation or other similar entity, the dissolution of the corporation or entity or the revocation of its charter or applicable organizational instrument; or

    (iv)    if the Interest Holder is an estate, the distribution by the fiduciary of the estate's entire interest in the limited liability company.

"Indemnified Party" has the meaning set forth in Section 14.4 hereof.

"Interest" means an Interest Holder's share of the capital, profits and losses of the Company and the right to receive distributions from the Company.

"Interest Holder" means any person who holds an Interest, whether as a Member or as an unadmitted assignee of a Member, or a successor in interest to another Interest Holder.

"Interest Holder Loan Nonrecourse Deductions" means any Company deductions that would be Nonrecourse Deductions if they were not attributable to a loan made or guaranteed by a Interest Holder within the meaning of Regulation Section 1.704-2(i).

"Interest Holder Minimum Gain" has the meaning set forth in Regulation Section 1.704-2(i) for "partner nonrecourse debt minimum gain."

"Involuntary Withdrawal" means, with respect to any Member, the occurrence of any of the following events:

    (i)    an assignment for the benefit of creditors by the Member;

    (ii)    the commencement of a case by the Member under the U.S. Bankruptcy Code;

    (iii)    the adjudication of an Member as bankrupt or insolvent or the entering against the Member an order for relief in any bankruptcy or insolvency proceeding;

(iv)        the filing of a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

(v)        the consent or acquiescence by the Member of the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

(vi)        the filing by the Member of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in subsections (i) through (v) above;

(vii)        the commencement of any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, which continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver or liquidator for the Interest Holder or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated;

(viii) if the Member is an individual, the Member's death or adjudication by a court of competent jurisdiction as incompetent to manage the Member's person or property;

(ix) if the Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust;

(x) if the Member is a partnership or another limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

(xi) if the Member is a corporation or other similar entity, the dissolution of the corporation or entity or the revocation of its charter or applicable organizational instrument; or

(xii) if the Member is an estate, the distribution by the fiduciary of the estate's entire interest in the limited liability company.

(xiii) if the Member is also an employee of the company and is terminated from that employment "for cause", as that term is defined in the employment contract.

"Member" means each Person signing this Agreement as a Member, whose name, business address, facsimile telephone number, if any, and e-mail address, if any, are as set forth on **Schedule A** attached hereto, and any Person who subsequently is admitted as a Member of the Company.

"Minimum Gain" has the meaning set forth in Regulation Section 1.704-2(d).

"Nonrecourse Deductions" has the meaning set forth in Regulation Section 1.704-2(b)(1).  The amount of Nonrecourse Deductions for a taxable year of the Company shall be determined according to the provisions of Regulation Section 1.704-2(c).

"Nonrecourse Liability" has the meaning set forth in Regulation Section 1.704-2(b)(3).

"Notice" has the meaning as set forth in Section 15.1.

"Officers" means the Person or Persons designated in, or in accordance with, Section 4.17 hereof to which the power to manage the day-to-day operations of the Company have been delegated by the Board of Directors, and any Person appointed as an additional or successor Officer.

"Percentage of Interests" means, as to a Member, the percentage set forth after the Member's name on **Schedule A**, as amended from time to time, and as to an Interest Holder who is not a Member, the Percentage of the Member whose Interest has been acquired by such Interest Holder, to the extent the Interest Holder has succeeded to that Member's Interest.

"Person" means any natural person, corporation, limited liability company, partnership, joint venture, association, estate, trust or other business, governmental or legal entity.

"Positive Capital Account" means a Capital Account with a balance of greater than zero.

"Profit" and "Loss" means, for each taxable year of the Company (or other period for which Profit or Loss must be computed) the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

(i)     all items of income, gain, loss, deduction or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss;

(ii)    any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss;

(iii)   any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss;

(iv)    gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes;

(v)     in lieu of the depreciation, amortization or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

(vi)    notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 8.3 hereof shall not be taken into account in computing Profit or Loss.

"Regulations" means the Income Tax Regulations promulgated under the Code, as amended from time to time.

"Tax Matters Member" any Tax Matters Member subsequently designated pursuant to the Regulations.

"Transfer" or "transfer" means any voluntary or involuntary act by which an Interest Holder makes, or attempts or purports to make, or suffers to occur, any gift, sale, mortgage, pledge, assignment, hypothecation, encumbrance

or other disposition of any Interest owned by him/her/it. The term "transfer" includes any transfer which takes place upon the death of an Interest Holder, whether by Last Will and Testament, operation of law or otherwise, and also includes any purported transfer, assignment, sale or other disposition by assignment or operation of law, as a result of the appointment of a trustee in bankruptcy for any Interest Holder, under any judgment or order, as the result of the appointment of a receiver for any Interest Holder, or as a result of any assignment for the benefit of creditors.

## ARTICLE III
### CAPITAL

Section 3.1.    Percentage of Interest. Each Member's Percentage of Interest in the Company shall be as set forth opposite such Member's name on such **Schedule A** attached hereto.

Section 3.2.    No Other Capital Contributions.  No Member shall be required to make any contribution to the capital of the Company, and except as set forth in the Act, no Member shall be bound by, or be personally liable for, the expenses, liabilities or obligations of the Company.

Section 3.3.    No Interest Paid on Capital Contributions.  No Interest Holder shall be entitled to receive interest on such Interest Holder's Capital Account or Capital Contribution.

Section 3.4.    Return of Capital Contributions.  Except as otherwise provided in this Agreement, no Interest Holder shall have the right to receive the return of any Capital Contribution. No Interest Holder shall be entitled to withdraw any part of such Interest Holder's Capital Account or Capital Contribution or to receive any distributions from the Company except as expressly provided in this Agreement.

Section 3.5.    No Right to Partition.  No Interest Holder shall have the right to require partition of the property of the Company or to compel any sale or appraisal of the Company assets or any sale of a deceased Interest Holder's interest in the Company's assets.

Section 3.6.    Form of Return of Capital.  If an Interest Holder is entitled to receive a return of a Capital Contribution, the Interest Holder shall not have the right to receive anything but cash in return of the Interest Holder's Capital Contribution.

Section 3.7.    Capital Accounts.  A separate Capital Account shall be maintained for each Interest Holder.

Section 3.8.    Loans.  Any Interest Holder may, at any time, make or cause a loan to be made to the Company in any amount and on those terms upon which the Company and the Interest Holder agree.

## ARTICLE IV
### MANAGEMENT

Section 4.1.    No Management Power.  No Member solely by virtue of being a Member may take part in the management, conduct or control of the business of the Company or have any right or authority to act for or bind the Company as a Member, except as otherwise provided in this Agreement.

Section 4.2.    Management by Board of Directors.  The conduct and control of the business and affairs of the Company shall be vested in a Board of Directors, which shall have the powers necessary and incidental to such conduct and control and, subject to the provisions of this Agreement, such powers shall include, without limitation, the right to

execute, deliver and file any assignment, debt instrument, contract or other agreements or documents required to be executed on behalf of the Company. No other Person shall have the authority to bind the Company unless such authority is specifically delegated to a Person by the Board of Directors, permitted by this Agreement or required by law.

      Section 4.3.     <u>Appointment of the Directors</u>.  The number of Directors shall be four (4), which number may be increased or decreased by the Consent of the Members.  The Directors shall be appointed by the Consent of the Members.  By execution of this Agreement, the Members hereby appoint **Richard K. Warner, William L. Parrish, II, William B. Russell**, and **Craig Engelbrecht** to act as the Directors of the Company as of the date of this Agreement.  The Members may remove and replace any Director by the Consent of the Members.

      Section 4.4.     <u>Management Powers</u>.  The powers of the Board of Directors shall include all powers necessary to manage the business and affairs of the Company and specifically (but without limitation) the following powers:

      (i)     to, on behalf of the Company, invest and reinvest the Company's funds in any financial institution, security, property or other investment as the Directors, in their sole discretion, deem appropriate;

      (ii)     to prepare and file, on behalf of the Company, such reports, certificates, forms, schedules or other documents as may be required by applicable law or which are deemed to be in the interest of the Company to prepare or file;

      (iii)     to cause the Company to withhold and pay over to any government entity any amounts required to be withheld by any federal, state or local tax law, including, without limitation, any such amounts required to be withheld from distributions to be paid to Members;

      (iv)     to cause the Company to borrow money and, if security is required therefor, to subject any property or assets of the Company to any security device, to obtain replacements of any security device, and to prepay, in whole or in part, refinance, increase, modify, consolidate or extend any loan or security device, all of the foregoing on such terms and in such amounts as the Board of Directors deems, in its sole discretion, to be in the best interests of the Company;

      (v)     to cause the Company to employ Persons, including the Members, Affiliates of the Members and/or Affiliates of the Directors, to provide products or services including managerial, financial or other services to and for the Company;

      (vi)     to, except as otherwise provided herein, cause the Company to enter into agreements and execute instruments in the name of the Company relating to other matters on such terms as the Directors may determine to be advisable; and

      (vii)     to, except as otherwise provided in this Agreement, have all the rights and powers of a member in a limited liability company operating solely under the terms and conditions of the Act.

      Section 4.5.     <u>Restrictions on Authority</u>.  With respect to the Company and its property, the Board of Directors shall have no authority to perform any act in violation of the Act or any other applicable laws or regulations thereunder, nor shall the Board of Directors have any authority, except with the Consent of the Members, to:

      (i)     do any act in contravention of this Agreement;

      (ii)     merge or consolidate the Company with another Person or entity, or sell all or a substantial part of the Company's assets to another Person or entity;

(iii)    admit any Person as a Member of the Company; or

(iv)    do any act which would make it impossible to carry on the ordinary business of the Company.

Section 4.6.    <u>Board of Directors Action</u>.    Except as otherwise provided in this Agreement, any action taken by the Board of Directors shall be approved by a majority vote of the Directors present and voting at any meeting at which a quorum is present.

Section 4.7.    <u>Place of Meetings</u>.  All meetings of the Directors shall be held at the principal office of the Company, or at such other place, either within or without the State of Maryland, as shall be determined by the Directors and designated in the notice of the meeting.   The Directors may conduct any meeting by telephone conference or other similar communications equipment if all persons participating in the meeting can hear each other at the same time. Participation in a meeting by such means shall constitute presence in person at such meeting.

Section 4.8.    <u>Periodic Meetings</u>.  The Board of Directors shall meet no less frequently than quarterly on a date designated at a regular meeting of the Board of Directors, for the purpose of the transaction of such business as may be properly brought before the meeting and for a general discussion of the state of the Company's business and affairs. If the periodic meeting shall not be held on the day designated by the Directors, a substitute meeting may be called in accordance with the provisions of Section 4.9 of this Article.

Section 4.9.    <u>Special Meetings</u>.  Special meetings of the Board of Directors may be called at any time by the President or by a majority of the Board of Directors.  Special meetings shall be held at the principal office of the Company, or at such other place as shall be designated in the notice of the meeting.

Section 4.10.    <u>Notice of Meetings</u>.  Notice stating the time and place of a Special meeting shall be delivered not less than twenty-four (24) hours nor more than thirty (30) days before the date thereof, by the person(s) calling the Special meeting, to each Director.  Notice of a Special Meeting need not specifically state the business to be transacted thereat.  Participation at any Special Meeting, in person or by teleconference where all Directors may hear and speak to each other at the same time, shall constitute a waiver of the notice requirements contained in this Section 4.10.

Section 4.11.    <u>Quorum</u>.  The presence at any meeting of three (3) of the Directors, in person or by teleconference where all Directors may hear and speak to each other at the same time, constitutes a quorum for the transaction of business at any meeting of the Board of Directors.

Section 4.12.    <u>Written Consents</u>.  In lieu of holding meetings, the Directors may vote or take action by a written consent of the Directors; provided, however, that sufficient votes must be represented by such written consents adequate to meet or exceed the voting threshold for a particular action (e.g., a majority or unanimous vote, as the case may be).

Section 4.13.    <u>Time Devoted</u>.  Each Director shall devote such time to the business and affairs of the Company as such Director, in such Director's sole and reasonable discretion, deems necessary to conduct the Company's business and affairs properly.

Section 4.14.    <u>Management Fee</u>.  Unless otherwise agreed to by the Members, the Directors shall not be paid a management fee for managing the Company as provided herein.

Section 4.15.    <u>Officers</u>.  The Board of Directors may delegate certain responsibilities for managing the day-to-day business and affairs of the Company to the Officers hereafter defined.  The Officers, if any, shall be elected by the Board of Directors.  Each Officer shall hold office until his or her successor is duly elected and qualifies or until his or her death, resignation or removal in the manner hereinafter provided.  The Board of Directors may elect such officers as it deems necessary.  Officers may consist of the following:

(i)      <u>President</u>.  The President shall in general supervise and control all of the day-to-day business and affairs of the Company.  If the President is a member of the Board of Directors, he or she shall preside at all meetings of the Board of Directors and of the Members at which he or she shall be present.  The President may execute any deed, mortgage, bond, contract or other instrument which the Board of Directors has authorized to be executed except in cases where the execution thereof shall be expressly delegated by the Board of Directors or by this Agreement to some other officer or agent of the Company or shall be required by law to be otherwise executed; and in general shall perform all duties incident to the office of President and such other duties as may be prescribed by the Board of Directors from time to time.  The President shall be **Richard K. Warner**.

(ii)      <u>Vice President</u>.  The Company may have one or more Vice Presidents.  A Vice President shall, in the absence of the President, perform the duties of the President and when so acting shall have all of the powers of and be subject to all the restrictions upon the President; and shall perform such other duties as from time to time may be assigned to him or her by the President or the Board of Directors.  The Executive Vice Presidents of the Company shall be **William L. Parrish, II, William B. Russell., and Craig Engelbrecht.**

(iii)      <u>Secretary</u>.  The Secretary shall (a) keep the minutes of the proceedings of the Members and the Board of Directors in one or more books provided for that purpose; (b) see that all notices are duly given in accordance with the provisions of this Agreement or as required by law; (c) be custodian of the Company records; (d) keep a register of the post office address of each Member which shall be furnished to the Secretary by each of the Members; and (e) in general, perform such other duties as from time to time may by assigned to him or her by the President or the Board of Directors.  The Secretary shall be **William L. Parrish, II.**

(iv)      <u>Treasurer</u>.  The Treasurer shall (a) have custody of the Company funds; (b) keep full and accurate accounts of receipts and disbursements in books belonging to the Company; (c) deposit all moneys and other valuable effects in the name and to the credit of the Company in such depositories as may be determined by the President; and (d) in general, perform such other duties as from time to time may by assigned to him or her by the President or the Board of Directors.  The Treasurer shall be **William B. Russell**.

Section 4.16.    <u>Removal of Officers/Vacancies</u>.  Any officer or agent of the Company may be removed by the Board of Directors if in its judgment the best interests of the Company would be served thereby, but such removal shall be without prejudice to the contract rights, if any, of the person so removed.  A vacancy in any office shall be filled by the Board of Directors.

ARTICLE V
<u>MEETINGS OF MEMBERS</u>

Section 5.1.    <u>Place of Meetings</u>.  All meetings of the Members shall be held at the principal office of the Company; provided, meetings may be held at such other place as shall be determined by the Board of Directors or agreed upon by the Members and designated in the notice of the meeting.  The Members may conduct any meeting by telephone conference or other similar communications equipment if all persons participating in the meeting can hear and speak to each other at the same time.  Participation in a meeting by such means shall constitute presence in person at such meeting.

Section 5.2. <u>Meetings</u>. Meetings of the Members may be called and held at any time no more than two (2) days after notice is provided by the Directors, or by any Member. Meetings shall be held at the principal office of the Company, or at such other place as shall be designated in the notice of the meeting.

Section 5.3. <u>Notice of Meetings</u>. Notice stating the time and place of the meeting shall be delivered not less than two (2) days nor more than thirty (30) days before the date thereof, by the person calling the meeting, to each Member. Notice of the meeting need not specifically state the business to be transacted thereat. Participation at any meeting, in person or by teleconference where all Members may hear and speak to each other at the same time or by proxy, shall constitute a waiver of the notice requirements contained in this Section 5.3.

Section 5.4. <u>Quorum</u>. The presence, at any meeting of the Members, in person or by teleconference where all Members may hear and speak to each other at the same time or by proxy, of all Members constitutes a quorum for the transaction of business at any meeting of the Members. Unless otherwise provided herein, all actions of the Members will be taken by at least a Consent of the Members present and voting at any meeting at which a quorum is present

Section 5.5. <u>Written Consents</u>. In lieu of holding meetings, the Members may vote or take action by a written consent of the Members; provided, however, that sufficient votes must be represented by such written consents adequate to meet or exceed the voting threshold for a particular action (e.g., a majority or unanimous vote, as the case may be).

Section 5.6. <u>Proxies - Members</u>. A Member may vote at a meeting of the Members in person or by proxy executed in writing by such Member or by such Member's duly authorized attorney-in-fact. Such proxy shall be filed with the Company before or at the time of such meeting of the Members.

## ARTICLE VI
<u>FEES, REIMBURSEMENTS AND EXPENSES</u>

Section 6.1. <u>Expenses Generally</u>. The Board of Directors shall cause the Company's expenses to be billed directly to and paid by the Company. The Company shall reimburse the Members or Directors, or Affiliates of either the Members or Directors, for expenses of the Company advanced or paid by them, whether prior to or after formation of the Company. The Board of Directors will establish an expense budget for each calendar year. The officers shall have no authority to exceed established budget items without the unanimous approval of the Directors first being obtained.

Section 6.2. <u>Certain Company Expenses</u>. The Company shall pay all expenses of the Company, including all expenses incurred in connection with the business of the Company, which may include, but are not limited to:

(i)     costs of personnel employed by the Company;

(ii)    costs of borrowed money, taxes and assessments on Company property and other taxes applicable to the Company;

(iii)   management, franchise, legal, appraisal, audit, accounting, brokerage and other fees;

(iv)    cost of supplies, services, equipment, travel, promotion and insurance as required in connection with the business of the Company;

(v)     expenses of organizing, revising, amending, converting, modifying or terminating the Company or this Agreement; and

(vi)    expenses of the Tax Matters Member or any management fee due to any Director in connection with such Director's performance of any duties in that capacity.

Section 6.3.     <u>Priority of Fees and Expenses</u>.  Prior to the making of any distributions to Interest Holders pursuant to Article VII or otherwise pursuant to this Agreement, the Company shall make, or provide a reserve for, payment of all fees and expenses described in this Article VI.

ARTICLE VII
<u>DISTRIBUTIONS</u>

Section 7.1.     <u>Distribution of Capital Proceeds from Capital Transactions</u>.  Capital Proceeds shall be applied by the Company and distributed to the Interest Holders in the following order and priority:

(i)     first, to the payment of all expenses of the Company incident to the Capital Transaction; then

(ii)    to the establishment of any reserves that the Board of Directors deems necessary and prudent to satisfy liabilities or obligations of the Company; and then

(iii)   the balance shall be distributed to the Interest Holders in accordance with their respective Percentages of Interests.

Section 7.2.     <u>Distributions in Liquidation</u>.  The proceeds arising from the winding up of the business and affairs of the Company as provided in Article X shall be used first to pay all of the Company's debts, liabilities and obligations to creditors, including debts owing to Interest Holders, and all expenses incurred in connection with the dissolution, winding up and termination of the Company and distribution of its assets as herein provided.  The amount remaining shall be distributed to the Interest Holders in accordance with the Positive Capital Account balances of the Interest Holders, as determined after taking into account all Capital Account adjustments (other than the adjustment required as a result of the distribution of such balance) for the Company's taxable year or years during which such winding up occurs.  No Interest Holder shall be obligated to restore a negative capital account.

Section 7.3.     <u>Reserves in Liquidation</u>.  The Board of Directors may set aside as a reserve for contingencies or expend for any Company purpose any amounts received from the winding up the Company's business and affairs that the Board of Directors, in its sole discretion, deems reasonably necessary or appropriate for the orderly winding up of the Company, including contingent liabilities or obligations of the Company.  At such time as the Board of Directors shall deem, in its sole discretion, that any such reserve is no longer required or appropriate, the amount of such reserve shall be distributed in accordance with Section 7.2 hereof.

Section 7.4.     <u>Accountants to Make Determinations</u>.  Except with respect to matters as to which the Board of Directors is granted discretion hereunder, the opinion of the Accountants shall be final and binding with respect to all disputes as to computations and related determinations required to be made under this Article VII.

Section 7.5.     <u>Timing</u>.  Except as otherwise provided in this Agreement, the timing of all distributions pursuant to this Article VII shall be determined by the Board of Directors.

Section 7.6.     Withholding.  The Company is authorized to withhold from payments and distributions to any Interest Holder and to pay over to any federal, state or local government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law.  All amounts withheld pursuant to this Section 7.6 shall be treated as amounts paid or distributed to such Interest Holder pursuant to this Article VII for all purposes under this Agreement.

Section 7.7.     Tax Distributions.  Notwithstanding anything to the contrary contained in this Article VII, Available Cash shall be distributed within ninety (90) days of the end of such taxable year to each Interest Holder in an amount equal to such Interest Holder's allocable share of Profits, net of such Interest Holder's allocable share of Losses (the "Taxable Share"), multiplied by the highest rate of federal, state and local income tax applicable to the Interest Holder on such Interest Holder's Taxable Share, less the aggregate amount of all prior distributions made to such Interest Holder with regard to such taxable year. In the event the Accountants determine that the Interest Holders will have taxable income for which they are required to pay quarterly estimated tax deposits then Available Cash shall be distributed, in an amount necessary to pay such deposits, within thirty (30) days of the end of each calendar quarter to such Interest Holders, in addition to the distribution stated above.

## ARTICLE VIII
## ALLOCATIONS OF PROFITS AND LOSSES

Section 8.1.     Allocation of Profits and Losses in General. After giving effect to the special allocations set forth in Section 8.3 hereof, Profits and Losses for any taxable year of the Company shall be allocated to the Interest Holders in accordance with their respective Percentages of Interests.

Section 8.2.     Allocations on Transfer of Interest.   In any taxable year in which an Interest Holder sells, assigns or transfers all or any part of such Interest Holder's Interest to any Person in accordance with the provisions of Section 9.1 hereof, Profits and Losses attributable to the Interest so sold, assigned or transferred shall be allocated between the transferor and the transferee in accordance with Section 706 of the Code and any Regulations promulgated thereunder using any permissible convention selected by the Board of Directors.

Section 8.3.     Regulatory Allocations.

(i)     Qualified Income Offset.  No Interest Holder shall be allocated Loss or a deduction which causes such Interest Holder to have an Adjusted Capital Account Deficit.  If an Interest Holder receives (a) an allocation of Loss or deduction (or item thereof) or (b) any Company distribution which causes such Interest Holder to have an Adjusted Capital Account Deficit at the end of any Company taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for such taxable year (and, if necessary, for subsequent taxable years) shall be allocated to such Interest Holder, before any other allocation is made of Company items for such taxable year, in the amount and in proportions required to eliminate such deficit. If an allocation of Loss or deduction would cause an Adjusted Capital Account Deficit in the event of liquidation of the Company or of such Interest Holder's Interest, then the allocation of Loss or deduction (or item thereof) shall not be made to such Interest Holder.  For purposes of this Section 8.3(i), each Interest Holder's Capital Account shall be deemed to be reduced by reasonably expected adjustments or allocations under Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4) and (5) and by reasonably expected distributions to the extent not offset by reasonably expected Capital Account increases (other than increases pursuant to this Section 8.3(i)).  For purposes of calculating reasonably expected Capital Account increases, the value of each Company asset shall be presumed to be equal to its adjusted basis for federal income tax purposes.  This Section 8.3(i) is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Treasury Regulations promulgated under Section 704(b) of the Code, and shall be calculated separately for each Interest Holder consistent with, and in compliance with, such regulations.

(ii)     Minimum Gain Chargeback. Except as set forth in Regulation Sections 1.704-2(f)(2), (3) and (4), if, during any taxable year, there is a net decrease in Minimum Gain, each Interest Holder, prior to any other allocation pursuant to this Article VIII, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Interest Holder's share of the net decrease of Minimum Gain, computed in accordance with Regulation Section 1.704-2(g)(2). Allocations of gross income and gain pursuant to this Section 8.3(ii) shall be made first from gain recognized from the disposition of Company assets subject to nonrecourse liabilities (within the meaning of the Regulations promulgated under Code Section 752), to the extent of the Minimum Gain attributable to those assets, and thereafter, from a pro rata portion of the Company's other items of income and gain for the taxable year. It is the intent of the parties hereto that any allocation pursuant to this Section 8.3(ii) shall constitute a "minimum gain chargeback" under Regulation Section 1.704-2(f).

(iii)     Interest Holder Minimum Gain Chargeback. Except as otherwise provided in Regulation Section 1.704-2(i)(4), if, during any taxable year, there is a net decrease in Interest Holder Minimum Gain attributable to an Interest Holder Loan Nonrecourse Deductions, each Interest Holder who has a share of the Interest Holder Minimum Gain attributable to such Interest Holder Loan Nonrecourse Deduction, determined in accordance with Regulation Section 1.704-2(i)(5), prior to any other allocation pursuant to this Article VIII, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Interest Holder's share of the net decrease of Interest Holder Minimum Gain attributable to such Interest Holder Loan Nonrecourse Deduction, computed in accordance with Regulation Section 1.704-2(i)(4). Allocations of gross income and gain pursuant to this Section 8.3(iii) shall be made first from gain recognized from the disposition of Company assets subject to nonrecourse liabilities (within the meaning of the Regulations promulgated under Code Section 752), to the extent of the Interest Holder Minimum Gain attributable to those assets, and thereafter, from a pro rata portion of the Company's other items of income and gain for the taxable year. It is the intent of the parties hereto that any allocation pursuant to this Section 8.3(iii) shall constitute a "minimum gain chargeback" under Regulation Section 1.704-2(i)(4).

(iv)     Contributed Property and Book-Ups. In accordance with Section 704(c) of the Code and the Regulations thereunder, as well as Regulation Section 1.704-l(b)(2)(iv)(d)(3), income, gain, loss and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Interest Holders so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of contribution (or deemed contribution). If the adjusted book value of any Company asset is adjusted as provided herein, subsequent allocations of income, gain, loss and deduction with respect to the asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under Code Section 704(c) and the Regulations thereunder.

(v)     Code Section 754 Adjustment. To the extent an adjustment to the tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases basis), and the gain or loss shall be specially allocated to the Interest Holders in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

(vi)     Nonrecourse Deductions. Nonrecourse Deductions for a taxable year or other period shall be specially allocated among the Interest Holders in proportion to their Percentages of Interests.

(vii)     Interest Holder Loan Nonrecourse Deductions. Any Interest Holder Loan Nonrecourse Deduction for any taxable year or other period shall be specially allocated to the Interest Holder who

15

bears the risk of loss with respect to the loan to which the Interest Holder Loan Nonrecourse Deduction is attributable in accordance with Regulation Section 1.704-2(b).

(viii)   Guaranteed Payments.  To the extent any compensation paid to any Interest Holder by the Company is determined by the Internal Revenue Service not to be a guaranteed payment under Code Section 707(c) or is not paid to the Interest Holder other than in the Person's capacity as a Member within the meaning of Code Section 707(a), the Interest Holder shall be specially allocated gross income of the Company in an amount equal to the amount of that compensation, and the Interest Holder's Capital Account shall be adjusted to reflect the payment of that compensation.

Section 8.4.   Distribution of Assets in Kind.   Subject to all of the special rules of this Section 8.4, if any assets of the Company are distributed to the Interest Holders in kind, such assets shall be valued on the basis of the fair market value thereof to determine the Profit or Loss that would have resulted if such assets were sold, and such deemed Profit or Loss shall be allocated as provided in Section 8.1 of this Agreement and shall be properly credited or charged to the Capital Accounts of the Interest Holders in accordance with Section 1.704-1(b)(2)(iv)(e) of the Regulations. In this event, the amount distributed and charged to the Capital Accounts of the Interest Holders receiving an interest in such distributed assets shall be the fair market value (instead of the adjusted basis) of such assets.  Any Interest Holder entitled to any interest in such assets shall receive such interest as a tenant-in-common with all other Interest Holders so entitled.  The fair market value of such assets shall be determined by the Board of Directors, or its agent.

## ARTICLE IX
## TRANSFER OF INTERESTS, PURCHASE OPTION AND WITHDRAWAL

Section 9.1.   Limitations on Transfers.

(i)   Each Interest Holder agrees not to transfer, or permit the transfer of, any Interest owned by the Interest Holder, other than in accordance with the terms and conditions of this Agreement.  Each Interest Holder further agrees that this Agreement shall apply to any Interest issued to, or acquired by, an Interest Holder subsequent to the date hereof.

(ii)   Any permitted assignee of an Interest shall be subject to all of the restrictions on the transferability of such Interest contained herein, and any assignee of an Interest shall have the rights of an Interest Holder, and not a Member, unless such assignee becomes a substitute Member pursuant to Section 9.2 hereof.

(iii)   No sale, transfer, assignment, pledge or other disposition of all or any part of an Interest (whether voluntary, involuntary or by operation of law) may be made unless all of the following conditions have been satisfied or waived by the non-transferring Members:

(a)   the sale, assignment, pledge or other disposition is not in contravention of any of the provisions of this Article IX;

(b)   a duly executed and acknowledged written instrument of assignment shall have been filed with the Company, which instrument shall specify the Interest, or portion thereof, being assigned and, in the case of the admission of a substitute Member, set forth the intention of the assignor that the assignee succeed to assignor's Interest as a substitute Member in such Member's place;

(c)   the assignor and assignee shall have executed and acknowledged such other instruments as the Board of Directors may deem necessary or desirable to effect such substitution, including the written acceptance and adoption by the assignee of the provisions of this Agreement; and

(d)     in the opinion of counsel to the Company, the assignment may be effected without registration under the Securities Act of 1933, as amended, and will not result in the violation of any applicable state securities laws.

(iv)     Any assignment, sale, exchange or other transfer in contravention of any of the provisions of this Article IX shall be void and ineffectual, and shall not bind or be recognized by the Company.

Section 9.2.     Power of a Member to Grant the Right to Become a Member to an Assignee of the Member's Interest.  No Member shall have the power to grant to an assignee or transferee of any part of such Member's Interest the right to become a Member of the Company.  The Members may, however, in their absolute discretion, unanimously consent, in writing, to the admission of an assignee or transferee of the Interest of a Member as a substitute Member.  Upon the granting of such consent, the Board of Directors shall file for recordation any documents or certificates which are required by applicable law to reflect any assignment made under this Section 9.2 where the assignee is to become a Member.  In no event shall an assignee become a substitute Member in place of such Member's assignor unless all of the conditions set forth in Section 9.1(iii) are first satisfied or waived.

Section 9.3.     Payment of Costs and Expenses.  All costs and expenses incurred by the Company in connection with the assignment of an Interest and/or the substitution of an assignee as a substitute Member, including any filing fees, publishing costs and the fees and disbursements of counsel, shall be pre-paid by the assigning Interest Holder, or if not paid by such Interest Holder, then by the assignee.

Section 9.4.     Substitute Members Bound.  Each Person who becomes a Member in the Company by becoming a substitute Member shall and does hereby agree to be bound by the provisions of this Agreement and does hereby ratify and agree to be bound by all prior actions taken by the Company and the Board of Directors.

Section 9.5.     Withdrawals.

(i)     Voluntary Withdrawal.  No Member shall have the right or power to voluntarily withdraw from the Company without the written consent of all the other Members.

(ii)     Involuntary Withdrawal.  Upon the occurrence of a Member's Involuntary Withdrawal the successor to such Member's Interest shall succeed to such Member's right to receive all of the Profits, Losses and distributions with respect to such Interest, but shall not become a substitute Member unless the provisions of Section 9.2 hereof are satisfied. If the remaining Members elect to refuse admission pursuant to Section 9.2 hereof the Company, or the remaining Members shall purchase the Involuntary withdrawing Member's Interest, subject to the provisions of Section 9.7 herein below.

Section 9.6.     Rights of First Refusal.  In the event an Interest Holder (a "Transferring Interest Holder") receives a Bona Fide Offer, the Transferring Interest Holder shall give Notice of the Bona Fide Offer (the "Notice of Offer") to the Company and to other Members (the "Remaining Members"), stating the identity of, and other relevant information about, the Person or entity making the Bona Fide Offer, the purchase price and all other terms and conditions of the proposed transfer.  Such Notice of Offer shall be deemed to be an offer to sell the entire Interest owned by the Transferring Interest Holder, in accordance with this Section 9.6, at the purchase price and upon the terms and conditions as are described in the Notice of Offer.

(a)     The Company, by majority vote of its Board of Directors, excluding the Transferring Interest Holder if the Transferring Interest Holder shall also be a Director, shall have the right to purchase the Transferring

Interest Holder's entire Interest, exercisable within thirty (30) days after the date of the Notice of Offer by sending a Notice of acceptance to the Remaining Members and to the Transferring Interest Holder.  Such Notice shall constitute the acceptance of the offer to sell the Transferring Interest Holder's Interest in accordance with the terms and conditions of the Notice of Offer; provided, however, that where the terms of the Notice of Offer are inconsistent with the terms of this Agreement, the terms of this Agreement shall prevail.  In the event the Company elects to purchase the Transferring Interest Holder's Interest, its Notice of acceptance shall establish a date, within sixty (60) days of the date of the Notice of Offer, for the closing of the purchase and sale of the Transferring Interest Holder's Interest.

(b)     In the event that the Company elects not to exercise its option to purchase the Transferring Interest Holder's Interest, then the Remaining Members shall have the right to purchase the Transferring Interest Holder's entire Interest in accordance with the terms and conditions of the Notice of Offer, exercisable within sixty (60) days after the date of the Notice of Offer by sending a Notice of acceptance to the Company and to the Transferring Interest Holder; provided, however, that where the terms of the Notice of Offer are inconsistent with the terms of this Agreement, the terms of this Agreement shall prevail.  If more than one of the Remaining Members shall exercise their right to purchase the Transferring Interest Holder's Interest, then each such Remaining Member shall have the obligation to purchase that portion of the Interest being offered to all the Remaining Members which is equal to the total Percentage of Interests so offered, multiplied by a fraction, the numerator of which is equal to the Percentage of Interests owned by each such Remaining Member, and the denominator of which is equal to the total Percentages of Interests owned by all Remaining Members exercising such right.  In the event the Remaining Members elect to purchase the Interest being offered by the Transferring Interest Holder, closing shall be held within ninety (90) days after the date of the Notice of Offer.

(c)     If neither the Company nor the Remaining Members have elected the options set forth in Sections 9.6(a) and 9.6(b) above within the time period set forth therein, the Remaining Members shall have the right to require, by providing written notice thereof to the Transferring Interest Holder within fifteen (15) days after the expiration of time set forth in Section 9.6(b), that the Transferring Interest Holder permit the Remaining Members to participate in the sale of Interests on a proportionate basis (the "Tag-Along Option").  Upon such election, the Transferring Interest Holder and Remaining Members shall participate proportionately (based on Percentages owned by each of them) in the sale of Interests pursuant to the Bona Fide Offer upon substantially the same terms and conditions stated in the Notice of Offer.

(d)     If neither the Company nor Remaining Members elects the to purchase the Transferring Interest Holder's Interest within the time and in the manner prescribed in Sections 9.6(a) and 9.6(b), and the Remaining Members do not elect the Tag-Along Option, then the Transferring Interest Holder shall be free to transfer all, and not less than all, of his Interest to the Person making the Bona Fide Offer upon substantially the same terms and conditions stated in the Notice of Offer.  Should that sale not close, then the Transferring Interest Holder thereafter shall not transfer said Interest without again complying with the provisions of this Article 9.6.

Section 9.7.     Purchase of Interest on Involuntary Withdrawal     Upon the Involuntary Withdrawal of a Member , as hereinbefore defined, the death or disability of a Member, all of the Interest owned by such Member shall be sold and purchased as herein provided.

(a) The Company shall purchase from the Withdrawing Member or the Personal Representative of the deceased Withdrawing Member  and the Withdrawing Member  or the Personal Representative of the deceased Member shall sell to the Company, all of their  Member Interest at the price and on the terms hereinafter set forth.

(b) The closing of such purchase and sale shall take place at the office of the Company on a date designated by the Company, which shall be not less than ten, or more than ninety days, following the date of the Involuntary Withdrawal or the qualification of the Personal Representative of the deceased Member, as the case may be.

(c)  If the Company shall not have sufficient surplus to permit it lawfully to pay for the purchase of all such Member Interest at the time or times required by this Agreement, all the Members shall promptly take such measures to vote their respective Interests to reduce the capital of the Company or take such other steps as may be appropriate or necessary to enable the Company lawfully to purchase and pay for the Member Interests to be purchased.

(d)  Alternatively, the Corporation may elect to purchase the Withdrawing Member Interest by installments pursuant to the terms of Section 9.9 hereafter, in which event the Company shall deliver its Promissory Note as hereafter described at the closing.

(e)  At closing the purchase price shall be paid either in cash, or partly in cash and partly by Promissory Note, and the Withdrawing Member, or such Members representative shall endorse over all Interests so purchased.

Section 9.8 <u>Involuntary Withdrawal Member Interest Price.</u>

(a)  The price for the Member Interest on Involuntary Withdrawal shall be the sum determined as follows:

(1)  As of the date of Involuntary Withdrawal or date of death, as defined above, the Withdrawing Member , or representative of the Withdrawing Member, and the Company will each obtain an appraisal of the value of the Member Interest. In the event such appraisals conclude that the value is within ten (10%) of each other the Member Interest Price will equal the average of such appraisals.  In the event such appraisals differ greater than ten (10%) percent both appraisers will jointly select a third appraiser whose valuation will be conclusive and binding on all parties

(2)  <u>Insurance.</u>   The Company may purchase Life Insurance and/or Disability Buy-Out Insurance insuring the life and health of each Member in a sum sufficient to provide a benefit equal to an estimate of the amount required under Section 9.8(a) plus an amount estimated to compensate the Company for any reasonable replacement expenditures and administrative costs associated with the loss of the insured Member.  The Company may name itself as beneficiary of the policies.  The policies and any proceeds received thereunder shall be held by the Company in trust for the purposes of this Agreement.  The Company shall pay all premiums on insurance policies purchased by it pursuant to this Agreement and shall give proof of payment to the Members within 15 days after the due date of each premium.  Alternatively, the Members may purchase policies of insurance insuring the lives and health of each other subject to all terms and conditions of this Agreement, and in such event the purchasing Member shall be subject to all terms and conditions of this Agreement as if the Company had owned said policies of insurance.

(b)  Rights of Ownership.  The Company shall be the sole owner of the policies issued to it and may apply to the payments of premiums any dividends declared and paid on the policies.

(c)  Payment of Purchase Price.  The price stated above shall be paid to the Withdrawing Member or the estate of the deceased Member within 30 days after the determination of an event of Involuntary Withdrawal or the qualification of a legal representative of an estate or within 10 days of the Corporation's receipt of the insurer's proceeds, whichever is later.

Section 9.9  <u>Installment Payments.</u>             In the event the Company elects to pay for the purchase by installments instead of in a lump sum, the purchase price shall be payable twenty-five percent (25%) at the closing, and the balance in ten semi-annual installments, with the first installment payable six months after the closing, and the remaining installments successively semi-annually thereafter.  The amount of each semi-annual installment shall be determined as follows:

(a)  The accountant then servicing the Company shall determine, semi-annually, the net profits earned by the Company, without accounting for salaries paid or payable to any Member employees (the "Net Available Cash").  The Net Available Cash shall be applied to the purchase price in the proportion to which the percentage of Interests purchased bears to the total issued and outstanding Interests as of the date of purchase. (i.e., if Net Available Cash from operations for a particular period equals $50,000, and the Interest purchased equaled 40% of all issued interests as of the date purchased, then the installment payment for that six month period would equal $20,000.)

(b)  <u>Notes.</u>  If the purchase is made by the Company in installments as provided in this section, the total purchase price shall be represented by a non-negotiable Promissory Note of the Company delivered to the Transferor. Upon the payment of each installment provided above the Note principal balance shall be reduced by the amount so paid. Any remaining principal and interest shall be due and payable on the fifth anniversary of the purchase date.

(c)  <u>Interest</u>.  Each promissory note above specified shall bear interest at the rate of 6% per annum from the date of the closing; shall provide that the maker may prepay all or any part thereof at any time with interest to date of prepayment, and that in the event of a default in the payment of any installment with interest which shall continue for 25 days

after the due date thereof, the remaining unpaid balance of the Note shall, at the option of the holder thereof, become due and payable forthwith.

## ARTICLE X
## DISSOLUTION, WINDING UP AND TERMINATION OF COMPANY

Section 10.1.    <u>Dissolution by Members</u>.  The Company may be dissolved by the unanimous written agreement of all the Members.

Section 10.2.    <u>Procedure for Winding Up</u>.  If the Company is dissolved, the Board of Directors shall wind up the business and affairs of the Company.  If there are no Directors of the Company, then the remaining Members shall wind up its business and affairs; if there are no remaining Members, the last Person to be a Member shall wind up its business and affairs; if there are neither Directors, remaining Members, or a Person who last was a Member, the legal or personal representatives of the Person who last was a Member shall wind up the business and affairs of the Company.  In winding up the business and affairs of the Company, all assets of the Company shall be sold, liquidated and converted to cash or cash equivalents as promptly as is consistent with obtaining the fair value thereof. Proceeds from the winding up of the business and affairs of the Company shall be distributed in accordance with Section 7.3 hereof.

Section 10.3.    <u>Termination</u>.  The Board of Directors shall terminate the Company following dissolution by filing Articles of Cancellation with the Maryland State Department of Assessments and Taxation.  If there are no Directors, then the Articles of Cancellation shall be filed by the remaining Members; if there are no remaining Members, the Articles shall be filed by the last Person to be a Member; if there are neither Directors, remaining Members, or a Person who last was a Member, the Articles shall be filed by the legal or personal representatives of the Person who last was a Member.

## ARTICLE XI
## BOOKS, RECORDS, ACCOUNTING AND TAX ELECTIONS

Section 11.1.    <u>Books, Records and Accounting</u>.  Adequate minute books and accounting records of all Company actions and business shall be maintained at the principal office of the Company and shall be open to inspection by any of the Members and their authorized representatives at all reasonable times upon reasonable notice. The Company shall report for income tax purposes on the cash method or accrual method of accounting, as determined by the Board of Directors.  Within seventy-five (75) days after the end of each taxable year and at the expense of the Company, the Management Committee shall cause to be prepared and sent to each Member financial statements for the preceding taxable year prepared by the Company in the ordinary course of its business, together with such appropriate information for purposes of preparing such Member's income tax returns for such taxable year.

Section 11.2.    <u>Bank Accounts</u>.  All funds of the Company shall be deposited in a bank account or accounts opened in the Company's name.  The Board of Directors shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

Section 11.3.    <u>Tax Elections</u>.  The Board of Directors shall have complete discretion with respect to the making or withholding of available elections for federal income tax purposes by the Company.  In the event of a transfer of all or any part of the interest of a Member or the termination of a Member's interest, the Members may, but shall not be required to, cause the Company to elect, pursuant to Section 754 of the Code, to adjust the basis of Company property.

21

Each Member agrees to provide the Board of Directors with such information as it may require in connection with any such election.

## ARTICLE XII
## POWER OF ATTORNEY

Section 12.1.     Appointment of Attorney-in-Fact.  Each Member irrevocably constitutes and appoints Richard K. Warner (the "Attorney-in-Fact"), with full power of substitution, as the Member's true and lawful attorney-in-fact, and in the name, place and stead of the Member, and on behalf of the Member, to sign, swear to, acknowledge, deliver, file and record:

(i)       all certificates and other instruments and amendments thereto which the Attorney-in-Fact deems appropriate to qualify, or to continue to qualify, the Company to do business in the jurisdictions in which the Company conducts business;

(ii)      all instruments and amendments thereto which the Attorney-in-Fact deems appropriate to reflect any change, modification or amendment of this Agreement or the Articles of Organization in accordance with the terms of this Agreement;

(iii)     any and all other documents, instruments or certificates required by law to be signed, sworn to, acknowledged, delivered, filed or recorded in the appropriate public offices by the Members or by the Company under any law of the State of Maryland or elsewhere, whenever, in the opinion of the Attorney-in-Fact, such action is necessary or desirable in order to enable the Company to carry on its business as contemplated in this Agreement;

(iv)     upon the dissolution, winding up or termination of the Company, any certificates, conveyances or other instruments that may be required to effectuate the same or the cancellation of the Articles of Organization; and

(v)      all consents to the transfer of interests in the Company, to the admission of substitute or additional Members into the Company or any other action, to the extent that such actions are authorized by the terms of this Agreement.  Notwithstanding any provision contained in this Article XII, no amendment to this Agreement shall increase the obligations of the Members, adversely affect the limited liability of the Members hereunder, or increase the profits interest of any Member, unless approved in accordance with Section 13.2 herein.

## ARTICLE XIII
## AMENDMENT OF AGREEMENT

Section 13.1.     Amendment by Board of Directors.  This Agreement may be amended by the Board of Directors, without the consent or approval of any Member, if in the opinion of the Company's attorneys the amendment is necessary or appropriate to satisfy the requirements of the Code with respect to partnerships, including amendments which in the opinion of such attorneys may be necessary or desirable under the provisions of the Code or Regulations promulgated thereunder to give effect to the allocations prescribed by Articles VIII hereof and the amendment does not adversely affect the interests of the Members.  At the option of the Board of Directors, any amendment made pursuant to this Section 13.1, to the extent possible, may be made effective as of the date of this Agreement.

Section 13.2.     Amendment Requiring Consent of Members.  Any amendments to this Agreement, except an amendment permitted by Section 13.1 hereof, may be made by the Board of Directors only with the unanimous consent of the Members.

Section 13.3.    <u>Amendments in Writing</u>.  Any amendment made pursuant to this Article XIII must be in writing.

**ARTICLE XIV**
LIMITATION ON LIABILITY AND INDEMNIFICATION

Section 14.1.    <u>Limitation of Liability – Interest Holders</u>.  No Interest Holder shall be liable, responsible or accountable in damages or otherwise to the Company or any Interest Holder for any action or omission by the Interest Holder on behalf of or with respect to the Company that is within the scope of the authority conferred on the Interest Holder by this Agreement or by law, unless such action was taken, or such omission was made criminally, fraudulently or in bad faith, or unless such action or omission constituted gross negligence or an intentional breach of this Agreement.

Section 14.2.    <u>Limitation on Liability – Board of Directors</u>.  No Director shall be liable, responsible or accountable in damages or otherwise to the Company or any Interest Holder for any action or omission by such Directors on behalf of or with respect to the Company that is within the scope of the authority conferred on such Director by this Agreement or by law, unless such action was taken, or such omission was made criminally, fraudulently or in bad faith, or unless such action or omission constituted gross negligence or an intentional breach of this Agreement.

Section 14.2.    <u>Indemnification</u>.  The Company shall indemnify each Director and Interest Holder (the "Indemnified Party") who, by reason of service on behalf of and with respect to the Company was, or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, for any damages or other costs and expenses incurred therefrom, unless the Company determines that such Indemnified Party has been made a party, or was threatened to be made a party, as a result of an act which was criminal, fraudulent or in bad faith, or as a result of gross negligence or an intentional breach of this Agreement.

(i)    <u>Payment of Expenses in Advance of Final Disposition of Action</u>.  If it is determined that an Indemnified Party is entitled to indemnification by the Company, expenses (including attorneys' fees) incurred in defending a civil, criminal, administrative or investigative action, suit or proceeding shall be paid by the Company in advance of the final disposition of that action, suit or proceeding.

(ii)    <u>Non-Exclusive Right to Indemnity; Inures to Benefit of Heirs and Personal Representatives</u>.  The rights of indemnification set forth in this Agreement are in addition to all rights to which the Indemnified Parties may be entitled as a matter of law, and shall continue as to a person who has ceased to be an Interest Holder or Director, and shall inure to the benefit of the successors, heirs and personal representatives of that Person.

(iii)    <u>Insurance</u>.  The Company may purchase and maintain insurance on behalf of any Indemnified Party, whether or not the Company would be required to indemnify that Person against that liability under the provisions of this Agreement.

**ARTICLE XV**
MISCELLANEOUS

Section 15.1.    <u>Notices</u>.  A Notice is a writing containing the information required or permitted by this Agreement to be communicated to any Person.  Any Notice shall be delivered personally, by commercial carrier, by facsimile with a machine-generated confirmation sheet or mailed by United States mail, postage prepaid via registered, certified or regular mail, to the Company at its principal place of business and to the Interest Holders at their respective addresses, or facsimile telephone numbers or e-mail addresses as set forth in **Schedule** A hereto, as amended from time

23

to time (or at such other addresses, facsimile telephone numbers or e-mail addresses as a Interest Holder may have previously specified by Notice to the Company as the address, facsimile telephone number or e-mail address to which Notice shall be given to him).  Notice given personally or by commercial carrier is effective upon delivery.  Notice given by facsimile with a machine-generated confirmation sheet is effective upon sending.  Notice given by e-mail is effective upon sending.  Notice given by United States mail is effective the third delivery day after the date of mailing.  Any Interest Holder may change such Interest Holder's address, facsimile telephone number or e-mail address to which Notices shall be sent by Notice to the Company in accordance with this section.  Upon any such change of address, facsimile telephone number or e-mail address, the Company shall send written notice thereof to the other Interest Holders in accordance with this section.

Section 15.2.    Entire Agreement.  This Operating Agreement contains a complete statement of all of the arrangements among the parties hereto with respect to the Company and cannot be changed or terminated orally or in any manner other than as provided in Article XIII.

Section 15.3.    No Presumption.  This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

Section 15.4.    Severability of Provisions.  If any provision of this Agreement, or the application thereof to any Person or circumstance, shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other Persons or circumstances shall not be affected but rather shall be enforced to the extent permitted by law.

Section 15.5.    Governing Law.  Irrespective of the place of execution or performance, this Agreement shall be governed by and construed in accordance with the laws of the State of Maryland, exclusive of its conflicts of laws principles.

Section 15.6.    Captions.  The captions, headings and titles in this Agreement are solely for convenience of reference and shall not affect its interpretation.

Section 15.7.    Counterparts.  This Agreement may be executed in any number of counterparts, and by different parties on different counterparts, each of which (taken together) shall be an original, but all of which shall constitute one instrument.

Section 15.8.    Terminology.  In this Agreement, all references made in the neuter, masculine or feminine gender shall be deemed to have been made in all such genders, and all references in the singular or plural number shall be deemed to have been made, respectively, in the plural or singular number as well.

Section 15.9.    Binding Effect.  This Agreement and all of the terms and provisions hereof will be binding upon and inure to the benefit of the Interest Holders and (to the extent provided herein) their respective heirs, executors, administrators, trustees, successors and permitted assigns.

Section 15.10.    Agreement to Execute Other Documents.  The Interest Holders shall execute and acknowledge any certificate required by law or necessary to conduct the business and affairs of the Company and any amendment to or cancellation of that certificate required by law, and shall execute and acknowledge similar certificates or affidavits or certificates of fictitious firm name, trade name or the like (and any amendments or cancellations thereof) required by the law of Maryland or any other jurisdiction in which the Company does or proposes to do business.

Section 15.11.    Estoppel Certificate. Each Interest Holder shall, within ten (10) days after written request by the Board of Directors, deliver to the requesting Person a certificate stating, to the Interest Holder's knowledge, that: (i) this Agreement is in full force and effect; (ii) this Agreement has not been modified except by any instrument or instruments identified in the certificate; and (iii) there is no default hereunder by the requesting Person, or if there is a default, the nature and extent thereof.  If the certificate is not received within that ten (10) day period, and in the absence of written objection of the Interest Holder to the certificate, the Board of Directors shall execute and deliver the certificate on behalf of the requested Interest Holder, without qualification, pursuant to the power of attorney granted in Article XII hereof.

Section 15.12.    Restrictive Covenant and Non-Disclosure Agreement. The parties recognize and agree that the Company will invest extensive time, energy and resources in the development of the _____business,  creation of intellectual property, recruiting its customers and clients, including the systems, procedures and information by which the business is marketed and operates.  Each of the Members will have access to the intellectual property, customers and clients and the participants in marketing programs and be able to develop personal relationships and professional relationships with such customers and clients.

All Members agree that during the term of this Agreement and thereafter each will not, directly or indirectly, disclose to any third party, or use or authorize any third party to use, any of the systems, procedures, information, or materials relating to the business or marketing practices of Company, or any names and/or addresses of customers and clients which are regarded as confidential by Company.

Each Member agrees that in the event the Member withdraws, either voluntarily or involuntarily, from the Company, that the Member will not take, carry away, or use in any manner, any materials, records, files, client or customer lists, marketing contacts lists or names, or documents belonging to or in the possession of the Company.

The Members agree that any concepts, materials, programs, brochures, manuals, etc. developed by the Company shall be owned by the Company and the Members obtain no rights in such materials except for the benefit of the Company, unless otherwise agreed to in writing with the Company.

As a material part of the consideration of this Agreement, each Member agrees that during the term of this Agreement, each will not, directly or indirectly, without Company's prior written consent, engage in a business that is competitive with or similar to the business of Company by becoming an owner, officer, director, shareholder, partner, associate, employee, agent, representative, or consultant or serve in any other capacity in any such business.

As an additional material part of the consideration of this Agreement, each Member agrees that for a period of two (2) years after any withdrawal from the Company, within a geographical radius of  the continental United States, which the parties agree is a reasonable amount, each Member shall not, directly or indirectly, own, manage, operate, be employed by, participate in, or be connected in any manner with any business or businesses in competition with any portion of Company's business without the express written consent of Company, which shall not be unreasonably withheld.  Specifically, each Member will not work with or for any client, customer, or associate of the Company nor contact, solicit, or assist the solicitation of any customer, client, or associate of Company for such Members own account or any other competitive company, whether within or without the geographic radius described above.  Nor will Members relate to any third party any of the information, systems, procedures, materials, lists, records, documents, or any other information as outlined above.

Each Member hereby acknowledges and agrees that any violation of this Section will cause damage to Company in an amount difficult to ascertain.  Accordingly, in addition to any other relief to which Company may be entitled, Company shall be entitled to temporary and/or permanent injunctive relief for any breach or threatened breach by any Member of the

terms of this Section without proof of actual damages that have been or may be caused to Company. Such remedy shall, however, not be exclusive and shall be in addition to any other remedy that the parties may have.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under seal as of the day and year first above written.

MEMBERS:

_____(SEAL)
Richard K Warner

_____(SEAL)
William L. Parrish

_____(SEAL)
William B. Russell

_____(SEAL)
Craig Engelbrecht

26

SCHEDULE A
TO
PRECISION CONTROL GRAPHICS, LLC
OPERATING AGREEMENT

| Names and Addresses of Members | Percentage of Interests |
|---|---|

Richard K. Warner                                        25%
C/o O&M Engineering, Inc.
10324B Baltimore National Pike
Ellicott City, Maryland 21042
Facsimile no.: (443) 325-0404
E-mail address: rkwarner@omengineering.com

William L. Parrish                                        25%
C/o Real World Solutions, Inc.
11127 Winterwood Lane
Indianapolis, IN 46235
Facsimile no.: (317) 826-7939
E-mail address:Bill.Parrish@rwsusa.com

William Brian Russell                                     25%
C/o Streamside Solutions, LLC
424 E. Elkhorn Avenue
P.O Box 1576
Estes Park, Colorado 80517
Facsimile no: (970) 577-0066
E-mail address:  brian@streamsidesolutions.com

Craig Engelbrecht                                         25%
C/o Quality Attributes Controls
614 Billy Sunday Road, Suite 500
Ames, Iowa 50010
Facsimile no. ( 515) 233-3380
E-mail address: cengelbr@qualityattributes.com

*1510395.v4*